[Civ. No. 39704. Second Dist., Div. One. Nov. 20, 1972.]

ROBERT HOWARD, Plaintiff and Respondent, v.
GLOBAL MARINE, INC., Defendant and Appellant.

**COUNSEL**

Sikes, Pinney & Matthew and Leon A. Pinney for Defendant and Appellant.

Lawrence R. Booth for Plaintiff and Respondent.

**OPINION**

LILLIE, J.—Plaintiff filed a personal injury action under the Jones Act (46 U.S.C.A. § 688) and the general maritime law; defendant appeals from a judgment entered in plaintiff's favor on a jury verdict. It contends that the trial court erred in instructing the jury that plaintiff was a "seaman" as a matter of law within the provisions of the act, and entitled to the warranty of seaworthiness. Additionally, it is urged that after giving an instruction defining "present cash value," the trial court erroneously refused to furnish the jury with the "Present Value Table" (Appendix to BAJI No. 14.70); and that lacking the accurate guides furnished by the table, the jury arrived at an award considerably in excess of that reasonably warranted under the circumstances.

Plaintiff sustained severe lung damage, for which recovery was here sought, while working as a deep-sea diver for defendant corporation whose business consisted of offshore drilling for various oil companies on a worldwide basis; at the time in question, one of its drilling vessels (*Glomar North Sea*) was located at Bahrain Harbor in the Persian Gulf. Plaintiff was hired by defendant in Los Angeles as a diving supervisor and flown to Bahrain; there he was called upon to supervise diving operations incident to biennial maintenance and repair on the *Glomar North Sea*. Known as "wet dry-docking," the above operation involved a process whereby hull cleaning and maintenance were performed with the vessel in the water; plaintiff's job (as foreman) was to oversee the work of the divers in that connection.

Plaintiff was also called upon to swim an underwater television camera which filmed the results of the "wet dry-docking" operation; he did so in

connection with a periodic inspection or survey contemporaneously made by the American Bureau of Shipping (A.B.S.), a rating bureau similar to Lloyd's, to ascertain whether the vessel complied with A.B.S. standards. At the time he was injured, plaintiff was assisting the A.B.S. inspector in his inspection of the underwater portions of the *Glomar North Sea.* The injury was caused by contaminated air from a scuba bottle or tank; when plaintiff got back on board the vessel, he was extremely ill and had great difficulty in breathing. The scuba bottles or tanks were then tested and found to be contaminated with oil. Three or four months later plaintiff was still expectorating oil, and medical testimony supported his claim that he would never be able to work again as a commercial diver or engage in heavy exertion even at sea level.

It is well settled that "[T]he Jones Act has been liberally interpreted to extend rather than restrict admiralty's traditional protection of those exposed to the risks of the sea. [Citations.] This has largely been accomplished by expanding the definition of such terms as 'seaman,' 'member of a crew' and 'vessel,' and nowhere has the expansion had greater impetus than in cases dealing with so-called 'special purpose vessels.' " (*Soucie* v. *Trautwein Bros.,* 275 Cal.App.2d 20, 24-25 [79 Cal.Rptr. 671].) Thus, in *Smith* v. *Union Oil Co.,* 241 Cal.App.2d 338, 344 [50 Cal.Rptr. 499], it was held that a deep-sea diver who died following an attack of the "bends" suffered during a dive from an offshore drilling ship was a "seaman" as that term has been defined in Jones Act cases. As pointed out in *Soucie,* "The effect of these decisions in the area of special purpose vessels is to encompass within the protection of the Jones Act as 'seamen,' workers who are not seamen in the traditional sense, and to substitute new and different criteria to determine the status. The traditional test [that] the worker be 'aboard primarily to aid in navigation' has been so watered down as to be rendered meaningless in this context." (*Supra,* p. 26.) As also pointed out in *Soucie,* citing *Producers Drilling Company* v. *Gray* (5th Cir.) 361 F.2d 432, 434, the cases have developed this rule governing the problem: ▮ Where a special purpose vessel is being used for its designed purpose, the injured worker is a "seaman" within the Jones Act if he was assigned permanently to the vessel or performed a substantial part of his work on the vessel, and his work contributed to the function of the vessel or to the accomplishment of its mission. (*Supra,* pp. 25-26.)

Defendant does not dispute the applicability of the above rule to the facts at bar, conceding that plaintiff thereunder *could* have been found to be a seaman accorded the protection of the act; what is disputed is the

removal of this assertedly fact question from the jury by the trial court's instruction that plaintiff was a "seaman" as a matter of law. The same problem was presented in *Soucie:* "That the vessel involved is a 'vessel' and the worker involved is a 'seaman' within the meaning of the Jones Act may be either a question of fact or a matter of law depending upon the circumstances of each case. But where the facts are undisputed and reasonable men could not draw conflicting inferences, the question of status with regard to both 'vessel' and 'seaman' should be decided as a matter of law by the court. (*Producers Drilling Co.* v. *Gray, supra,* 361 F.2d 432, 434-436; *Boatel, Inc.* v. *Delamore, supra,* 379 F.2d 850, 858.)" (*Supra,* p. 26.) Defendant argues that the question of status in the instant case, unlike that hypothesized in *Soucie,* was one which could lead to different conclusions among reasonable men and, therefore, should have been left to the jury.

■ The trial court should remove an issue from the jury's consideration only when any other determination would be so lacking in evidentiary support that the trial court would be impelled to set it aside as a matter of law (*Dailey* v. *Los Angeles Unified Sch. Dist.,* 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360]); the above rule also applies to Jones Act cases. (*Producers Drilling Company* v. *Gray, supra,* p. 437.) According to defendant, the following considerations or propositions would have warranted a finding in its favor not bereft of substantial legal sufficiency: Plaintiff's work was neither to navigate nor drill for oil, but rather to assist a shoreside inspector employed by a rating bureau (A.B.S.) and having only transitory business aboard the vessel; his job was one involving special skills and training not customarily found among seamen; the bulk of plaintiff's diving and television apparatus was specialized equipment flown with him from Los Angeles to the Persian Gulf (and back) and, therefore, incapable of being categorized as appurtenant to the vessel. ■ We conclude that neither the present state of the governing law nor the record on this appeal supports the foregoing propositions.

If the work then being done on the *Glomar North Sea* be considered in the category of repair and maintenance, "It is now clear that the seaworthiness doctrine extends to shore-based workmen performing ordinary or minor repairs aboard a ship deemed to be in navigation, even though the ship is docked and the injured party is employed by a third party which has generally contracted to do the work, at least so long as the ship is generally in commission and in control of the owner." (Annot. 84 A.L.R. 2d 632.) The same rule applies to cleaning operations: "It is now clear that

the seaworthiness doctrine extends to shore-based workmen performing nonextraordinary cleaning operations upon a ship in navigation, on the same basis of reasoning that it applies to those performing ordinary repairs aboard ship." (*Supra*, p. 639.) As stated in a landmark case, the warranty should be applied because such a shore worker "is, in short, a seaman . . . doing a seaman's work and incurring a seaman's hazards." (*Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85, 99 [90 L.Ed. 1099, 1109, 66 S.Ct. 872].)

As with all drilling vessels, the *Glomar North Sea* was staffed by a marine crew (to navigate the ship) and a drilling crew which carried out the ship's mission of drilling for oil. The evidence is undisputed that the ship's crew on a typical drilling vessel, such as the *Glomar North Sea,* also included a minimum of five divers who assisted in the drilling operations; they performed a variety of underwater functions such as changing hydraulic or pneumatic lines and reconnecting such lines, as well as visual inspection, maintenance and repair. It is also undisputed that diving equipment is a normal part of the ship's complement. Plaintiff's testimony with regard to the matters above outlined was corroborated by his immediate supervisor, Mr. Dion, called as an adverse witness. The latter testified that the vessel was undergoing repair and maintenance and that plaintiff assisted in the job of repairing the ship by supervising the underwater work; he also stated that there was nothing experimental or unusual about the activities then being performed by plaintiff.

In the main, it is plaintiff's use of the television equipment which assertedly makes the question of his status one of fact for the jury. Cited by defendant in that regard is *Godfrey* v. *United States* (S.D.Cal.) 248 F.Supp. 273, which involved the use by an electronic technician aboard a naval vessel of closed (underwater) circuit television in connection with the retrieving of dummy missiles; in the court's opinion, Godfrey's duties "were not connected with the ship's seagoing operations and he was not an employee of the Navy." (*Supra*, p. 275.) The case, both in its facts and underlying rationale, is manifestly dissimilar from our case. Furthermore, it seems undisputed that plaintiff's use of the television equipment was confined to his work in assisting the A.B.S. survey and consumed less than two hours; the rest of his working time in Bahrain Harbor, some two and one-half weeks (including several hours each day in the water), was devoted to maintenance and report of the *Glomar North Sea* and supervision of divers engaged in similar work. When the above time periods are contrasted, that devoted to the survey becomes insignificant and, therefore, incidental. Furthermore, we agree with the trial court that the survey was not unrelated to the vessel's mission or purpose; thus, in support of

its announced intention to give the challenged instruction relative to plaintiff's status as a seaman, the court reasoned that "A survey by the American Bureau of Shipping is for the benefit of the ship in that it benefits the ship in many ways such as affecting her insurance rate, giving some measure of a guarantee of seaworthiness in a sense is a final inspection of maintenance and repair work to determine that it is properly done. . . . In this instance the plaintiff was acting as a diver and was working as directed by the surveyor so as to permit him to determine whether or not maintenance and repair had been properly accomplished."

Defendant relies on the *Producers Drilling Company* case (*supra,* 361 F.2d 432, 434) for the proposition that the terms "seaman" and "member of a crew" have such a wide range of meaning that, except in rare instances, only the trier of fact can determine their application in the circumstances of a particular case; but the court also noted " 'the mistaken belief of so many that merely because the status of *who* may be a seaman may be a question of fact, the principles summarized by us in Offshore Co. v. Robinson [266 F.2d 769] perforce make every case one of fact for the jury.' [Citation.]" ■ The above reasoning was adhered to in the *Soucie* case (*supra,* 275 Cal.App.2d 20, 27) and governs here; the test is not whether there was room for conflicting inferences but whether such inferences could *reasonably* be drawn. ■ In our view, the totality of circumstances at bar does not warrant any such action. Accordingly, the trial court did not err in giving the instruction here challenged.

■ Defendant's remaining assignment of error relates to the implementation of its requested instruction concerning future pecuniary loss (BAJI No. 14.70).[1] The court having indicated its intention to give such instruction, defendant requested that a "Present Value Table" (Appendix B to BAJI, Fifth Edition) be furnished the jury for its assistance, and that judicial notice be taken of the very numerous computations therein contained; such computations, resulting in the "present cash value" sought to be fixed, are based on certain determinables—the constant annual amount, the number of years it will continue, and the rate of interest return. The court, in response to defendant's request, took judicial notice of the mathematical computations in the table but declined to extend such notice to the table's

---

[1]BAJI No. 14.70: "Any award for future pecuniary loss must be only for its present cash value.

"Present cash value is the present sum of money which, together with the investment return thereon when invested so as to yield the highest rate of return consistent with reasonable security, will pay the equivalent of lost future benefits at the times, in the amounts, and for the period that you find such future benefits would have been received.

"The present cash value will, of course, be less than the amount you find to be the loss of such future benefits."

use or furnish a copy to the jury. After some four hours of actual deliberation, the jury returned and requested clarification on the use of the instruction (fn. 1). In response to certain questions, the court first told the jurors that they were required to reduce future pecuniary loss to present cash value; it reread the instruction and attempted to explain the computation principle set forth therein. There still being some uncertainty whether the principle or formula was fully understood, the parties stipulated (outside the jury's presence) that the jury could agree on the determinables earlier mentioned (the amount of earning capacity loss per year, the number of such years, etc.) following which the court and counsel would apply the mathematical computations found in the BAJI table. The court then advised the jury of the agreement reached, stating (more than once) that this was an optional procedure which the jurors could utilize if they so desired; the option was never exercised. Thus, after 45 minutes of further deliberation, the jury returned a verdict, general in form, assessing damages in the sum of $170,000.

Defendant now argues that the confusion, reflected by the earlier questions of certain jurors as to the use of the table, continued during their later (and concluding) deliberations; the table contains a five-step procedure for its use which should have been judicially noticed by the court; and since the court failed to do so, the jury lacked an accurate guide in any computations leading to the sum eventually assessed by way of damages. Such argument would be more persuasive had defendant not agreed to the optional arrangement above mentioned; accordingly, we cannot presume that the jurors were unable to make the various computations without the proffered aid of court and counsel after first reaching necessary agreement on the various determinables comprising the formula. Further, defendant's counsel took a calculated risk in this regard; he produced neither statistician nor economist to aid his cause in this regard. Too, we have found no California cases which hold that use of the present table is indispensable to a proper award of damages for loss of future earning capacity; in *Wilson* v. *Gilbert,* 25 Cal.App.3d 607, 614 [102 Cal.Rptr. 31], the court observed that "There are 'present cash value' tables which *might* have assisted the jury in this regard, if judicially noticed for instruction purposes . . . ." (Italics added.)

Additionally, since the jury's verdict was general in form, it is impossible to determine what amount was allowed for special damages (including the item covered by the above discussion) and what portion of the total constituted general damages for pain and suffering. At the time of trial plaintiff was 35 years of age; he testified that he lost a job, by reason of the accident,

which would have paid him $30,000 a year in salary and bonuses; there was other competent testimony that a diver less qualified than plaintiff, could earn $3,000 or $3,500 per month. As indicated earlier, plaintiff no longer can engage in such gainful employment. No challenge is made to plaintiff's claim that his "prospective loss of earnings alone . . . could easily be calculated at $260,000.00, or more, before reduction to present value." Also, plaintiff cannot engage in heavy exertion; a medical expert stated that any "spurt type of activity" such as running or climbing would lead to unconsciousness. Accordingly, defendant's claim of prejudice by reason of all of the above matters cannot be sustained.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 17, 1973.