[No. D018780. Fourth Dist., Div. One. Mar. 11, 1996.]

MARIA VALLBONA et al., Plaintiffs and Respondents, v.
ROY C. SPRINGER et al., Defendants and Appellants.

## COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard and Douglas R. Reynolds for Defendants and Appellants.

Finkelstein & Finkelstein, Norman M. Finkelstein and Mark C. Hinkley for Plaintiffs and Respondents.

## OPINION

**KREMER, P. J.**—Defendants Roy C. Springer et al.[1] appeal a judgment after jury trial favoring plaintiffs Maria Vallbona et al.[2] on their complaint for fraud, negligent misrepresentation, and breach of contract. Defendants attack the propriety and amount of the punitive damages award favoring plaintiffs. Defendants also assert evidentiary and instructional errors. We affirm the judgment.

## I

### INTRODUCTION

Knowing the United States Food and Drug Administration (FDA) had not approved use of a low-level laser procedure to remove cellulite, unwelcome lumpy fat deposits especially in the thigh and buttocks, California-licensed physician Dr. Springer opened the Laser Center clinic in Tijuana, Mexico, to perform such procedure. Dr. Springer solicited persons in San Diego to enroll in his Tijuana clinic for laser removal of cellulite. In soliciting plaintiffs, Dr. Springer made various misrepresentations involving past use of the laser procedure in Europe to remove cellulite and the anticipated FDA approval of such procedure for use in the United States. Relying on Dr. Springer's representations, plaintiffs underwent the laser procedure at his Tijuana clinic without significant removal of cellulite. Plaintiffs sued defendants on fraud and contractual theories. By special verdict the jury found for plaintiffs on all causes of action.

---

[1] We refer to defendant Roy Springer as Dr. Springer. Other defendants are his wife Jan Springer (Mrs. Springer) and Springer Laser Center (Laser Center). We may refer to Dr. and Mrs. Springer collectively as the Springers.

[2] Other plaintiffs involved in this appeal are Vonnie K. Hartwigsen and Helen Roosdahl.

## II

### FACTS

In 1988 Dr. Springer learned of a procedure using a low-level laser to remove cellulite. Aware that the FDA had not approved the laser procedure for use in the United States in removing cellulite, Dr. Springer contacted the FDA about the approval process. Because of the lack of FDA approval, Dr. Springer did not open a laser therapy clinic in San Diego.

In April 1989 the Springers formed a Mexican corporation, bought four lasers in the corporation's name and established the Laser Center clinic in Tijuana to perform the laser procedure on cellulite.[3] In 1989 and 1990 defendants through advertising solicited San Diego area patients with unwanted cellulite to enroll at the Tijuana clinic for the laser procedure as an alternative to liposuction surgery. Defendants represented that the laser procedure had been used in Europe in the last five years with more than twenty-three thousand people treated for cellulite. Defendants also represented there was little or no reoccurrence of cellulite in the thousands of cases on record since the laser treatment was first used.

In 1989 and 1990 defendants falsely represented to plaintiffs that although the FDA had not yet approved the laser technique used by defendants, an application for approval was pending before the FDA with such approval expected within a few months. Defendants told plaintiffs the new low-level laser technique was the most effective and convenient method developed for removing cellulite. Defendants also represented that at the end of a specified period of treatment plaintiffs would have the legs, hips, or buttocks they wanted.

Relying on defendants' representations, plaintiffs enrolled at defendants' Tijuana clinic for removal of cellulite through the laser procedure. Beginning in September 1989, plaintiff Roosdahl underwent the laser procedure about 80 times over the course of 11 months and was charged at least $2,000. Roosdahl's cellulite condition did not disappear or improve. Beginning in February 1990, plaintiff Hartwigsen underwent the laser procedure about 40 times over the course of 7 months without improvement and was charged $2,000. Beginning in March 1990, plaintiff Vallbona underwent the laser procedure forty-seven times over the course of five or six months and was charged $2,000. Vallbona's cellulite condition remained the same.

---

[3]Dr. Springer was the Mexican corporation's president and director. Mrs. Springer was corporate vice-president and marketing director.

## III

### SUPERIOR COURT PROCEEDINGS

In August 1991 plaintiffs filed this lawsuit seeking damages for intentional misrepresentation as to a past or existing material fact, negligent misrepresentation, and breach of contract. Plaintiffs alleged they spent considerable sums to undergo defendants' laser procedure based upon various misrepresentations. Plaintiffs also alleged defendants breached their oral contracts with plaintiffs by failing to remove plaintiffs' cellulite within the time promised and failing to provide plaintiffs with the promised leg, hip and buttock size reductions. Denying any liability, defendants asserted the laser procedure did not in any way damage plaintiffs.

After several discovery disputes, the matter came for jury trial in September 1992. Plaintiffs presented expert testimony that defendants distributed incorrect information. As a sanction for Dr. Springer's failing to respond and produce documents during discovery, the court excluded some proffered defense evidence and instructed the jury on various factual matters admitted by Dr. Springer.

By special verdict the jury made true findings against all defendants on all elements of plaintiffs' causes of action for intentional misrepresentation, negligent misrepresentation, and breach of contract. On the misrepresentation causes of action, the jury also found all defendants acted with oppression, fraud, or malice. The jury concluded defendants' conduct caused plaintiffs economic damages (Vallbona $6,295; Hartwigsen $11,800; and Roosdahl $8,730) and noneconomic damages (Vallbona $10,000; Hartwigsen $12,500; and Roosdahl $15,000).

Trial then proceeded to the punitive damages phase. Dr. Springer testified about defendants' assets. The jury assessed punitive damages of $125,000 against Dr. Springer; $75,000 against Mrs. Springer; and $25,000 against Laser Center.

In October 1992 the court entered judgment favoring plaintiffs on the jury's special verdict. Later the court denied defendants' motions for new trial or judgment notwithstanding the verdict.

Defendants appeal.[4]

---

[4]In August 1994 we denied plaintiffs' motion to dismiss the appeal.

## IV

### DISCUSSION

### A

### *Entitlement to Punitive Damages*

■ Asserting plaintiffs did not comply with the requirements of Code of Civil Procedure[5] section 425.13,[6] defendants brought a motion *in limine* to preclude plaintiffs from discussing or requesting punitive damages at trial. Citing *Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181 [10 Cal.Rptr.2d 208, 832 P.2d 924], defendants contended plaintiffs were impermissibly attempting to recast a potential medical malpractice action into a fraud/tort case with the possibility of punitive damages. The court denied defendants' motion.[7]

Defendants attack the ruling denying their motion *in limine* involving punitive damages. Defendants contend plaintiffs' noncompliance with section 425.13's requirements barred any punitive damages award since plaintiffs' claims were assertedly directly related to professional services rendered by defendants. However, since this record indicates defendants waived the benefit of section 425.13, we conclude the trial court properly denied defendants' motion in limine to preclude plaintiffs from pursuing punitive damages.

In August 1991 without obtaining court permission under section 425.13, plaintiffs filed a complaint against defendants containing claims for punitive damages. Defendants did not demur or move to strike plaintiffs' punitive damages allegations. In October 1991 defendants answered the complaint without mentioning section 425.13 or otherwise challenging the pleading's

---

[5]All statutory references are to the Code of Civil Procedure unless otherwise specified.

[6]Section 425.13, subdivision (a), provides: "In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code. The court shall not grant a motion allowing the filing of an amended pleading that includes a claim for punitive damages if the motion for such an order is not filed within two years after the complaint or initial pleading is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier."

[7]The court also noted defendants' motion *in limine* involving punitive damages was filed late and not served on plaintiffs.

inclusion of punitive damages claims. Defendants did not later challenge plaintiffs' punitive damages allegations by motion to strike or motion for judgment on the pleadings. Instead, defendants waited until the outset of trial in September 1992 to assert for the first time—by motion *in limine*—that plaintiffs' noncompliance with section 425.13 barred their claim for punitive damages. We conclude that by not earlier raising the issue of section 425.13, defendants waived any rights they might have had under that statute. (Cf. *Villa Pacific Building Co.* v. *Superior Court* (1991) 233 Cal.App.3d 8, 12 [284 Cal.Rptr. 227].)

In *Villa Pacific Building Co.* v. *Superior Court*, *supra*, 233 Cal.App.3d 8, the appellate court held Civil Code section 1714.10's requirement of a court order as a condition precedent to suit against an attorney for civil conspiracy with the attorney's client was "not jurisdictional and that, absent timely objection to a complaint filed without permission of court, the protection conferred by section 1714.10 is waived." (233 Cal.App.3d at p. 9.)[8] The appellate court stated: "We cannot think of any reason why section 1714.10 should be treated as jurisdictional. There is certainly nothing about the language of section 1714.10 to suggest that its benefit cannot be waived." (*Id.* at p. 11.) Characterizing section 1714.10 as "procedural," the appellate court stated a failure to comply with that statute was waived by a failure to raise such issue at the earliest opportunity. (233 Cal.App.3d at p. 11.)[9] Accordingly, the appellate court concluded "when a plaintiff fails to obtain

---

[8]As originally enacted in 1988, and as in effect when the plaintiffs here and in *Villa Pacific Building Co.* v. *Superior Court*, *supra*, 233 Cal.App.3d 8, filed their lawsuits, Civil Code section 1714.10 provided: " 'No cause of action against an attorney based upon a civil conspiracy with his or her client shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes a claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. The court may allow the filing of a pleading claiming liability based upon a civil conspiracy following the filing of a verified petition therefor accompanied by the proposed pleading and supporting affidavits stating the facts upon which the liability is based. The court shall order service of the petition upon the party against whom the action is proposed to be filed and permit that party to submit opposing affidavits prior to making its determination. The filing of the petition, proposed pleading and accompanying affidavits shall toll the running of any applicable statute of limitations until the final determination of the matter, which ruling, if favorable to the petitioning party, shall permit the proposed pleading to be filed.' " (*Hung* v. *Wang* (1992) 8 Cal.App.4th 908, 915, fn. 1 [11 Cal.Rptr.2d 113].) "The legislative history reveals that [Civil Code] section 1714.10 was patterned" on section 425.13. (*Hung* v. *Wang*, *supra*, at p. 934, fn. 6.)

[9]In *Villa Pacific Building Co.* v. *Superior Court*, *supra*, 233 Cal.App.3d 8, the appellate court observed ". . . the benefit of section 1714.10 can be waived in the same manner as a statute of limitations. Just as a statute of limitations is procedural, affecting only the remedy and not a substantive right [citations], so too is section 1714.10, which simply imposes a specified procedure to be followed before a substantive claim can be pursued. It follows that just as a limitations defense is waived by the failure to plead it at 'the earliest opportunity'

court approval before filing suit against an attorney on a conspiracy theory involving a client, the benefit conferred by section 1714.10 is waived unless the attorney objects at the first available opportunity—at the time of the attorney's first appearance, whether by demurrer or motion to strike or such other motion or application as may be appropriate. [¶] It follows necessarily that by answering and litigating this case for a year before moving to dismiss on the basis of section 1714.10, [the attorneys] waived any rights they might have had under the statute." (*Id.* at p. 12.)

Finding persuasive the analysis in *Villa Pacific Building Co.* v. *Superior Court, supra,* 233 Cal.App.3d 8, we conclude that section 425.13's requirement of a court order as a condition precedent to including a claim for punitive damages in an action arising out of the professional negligence of a health care provider is not jurisdictional, and absent timely objection to a complaint's inclusion of a punitive damages claim without court permission, the protection conferred by section 425.13 is waived. (233 Cal.App.3d at p. 12.) We find nothing in the language of section 425.13—the pattern for Civil Code section 1714.10—suggesting its benefit cannot be waived. (233 Cal.App.3d at p. 11.) Further, section 425.13, like Civil Code section 1714.10, is procedural, affecting only a remedy and not a substantive right. (233 Cal.App.3d at p. 11.) Hence, by answering plaintiff's complaint and litigating this case for almost a year before raising by motion *in limine* the issue of section 425.13, defendants waived any rights they might have had under the statute. (233 Cal.App.3d at p. 12.)

B

*Amount of Punitive Damages Not Excessive*

Defendants attack the amount of the punitive damages award as excessive since their assertedly "minimal" net worth was less than such award. Defendants contend the jury impermissibly ignored uncontradicted evidence of their liabilities and speculated about their net worth. However, in effect, defendants improperly seek reweighing on appeal of the credibility of Dr. Springer's trial testimony about defendants' asserted liabilities bearing on the issue of net worth. (*Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259 [259 Cal.Rptr. 311]; *Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727-728 [236 Cal.Rptr. 633]; *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 200-201 [231 Cal.Rptr.

[citation], so too is a failure to comply with section 1714.10 waived by a failure to raise it at the earliest opportunity." (*Id.* at p. 12.)

791].) Since it is not our function to weigh credibility, on this record we reject defendants' attack on the amount of the punitive damages award. (*Fortman* v. *Hemco, Inc., supra,* at p. 259.)

■ The California Supreme Court has observed that "review of punitive damage awards rendered at the trial level is guided by the 'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .' [Citation.] Stating the matter somewhat differently in a similar case, we indicated that an appellate court may reverse such award 'only " '[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' " ' [Citation.]" (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927-928 [148 Cal.Rptr. 389, 582 P.2d 980]; also *Fortman* v. *Hemco, Inc., supra,* 211 Cal.App.3d at p. 259; *Fagerquist* v. *Western Sun Aviation, Inc., supra,* 191 Cal.App.3d at pp. 727-728.)[10] The Supreme Court further stated that in determining whether a punitive damages award is excessive as a matter of law "we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages. One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Citations.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant;

---

[10]"It is well settled that damages are excessive only where the recovery is so grossly disproportionate to the injury that the award may be presumed to have been the result of passion or prejudice. Then the reviewing court must act. [Citations.] The reviewing court does not act de novo, however. As we have observed, the trial court's determination of whether damages were excessive 'is entitled to great weight' because it is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule . . . .' [Citation.] All presumptions favor the trial court's determination [citation], and we review the record in the light most favorable to the judgment [citation]." (*Fortman* v. *Hemco, Inc., supra,* 211 Cal.App.3d at p. 259.)

" 'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses . . . . As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' [Citations.]" (*Fagerquist* v. *Western Sun Aviation, Inc., supra,* 191 Cal.App.3d at pp. 727-728.)

obviously, the function of deterrence [citation], will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Neal* v. *Farmers Ins. Exchange, supra,* at p. 928, fn. omitted.) ▪ As noted, defendants' attack on the amount of the punitive damages award involves only the final consideration discussed in *Neal*, to wit, their wealth. Under the standards discussed in *Neal*, we cannot conclude the amount of punitive damages awarded plaintiffs was excessive as a matter of law.

At the liability/compensatory damages phase of trial, the jury found Dr. Springer had been willfully false and had defrauded plaintiffs. At the punitive damages phase of trial, plaintiffs elicited Dr. Springer's testimony about defendants' assets and asserted liabilities. Dr. Springer claimed a net worth of "much less than" $100,000. At the punitive damages phase, the jury knew that Dr. Springer had been given notice to bring to trial all documentary evidence on the issue of net worth. In the jury's presence, Dr. Springer admitted he knew he would be asked to present evidence of his net worth and that his best interests dictated he bring to trial all documentary evidence demonstrating the existence of debts, liens or encumbrances assertedly reducing such net worth. However, in response to plaintiffs' discovery requests for all documents involving assets he owned, the only document Dr. Springer produced before trial was a handwritten loan application never submitted to any institution. Further, at the punitive damages phase, Dr. Springer failed to produce documents confirming the existence of most of his asserted liabilities. Instead, Dr. Springer presented only minimal evidence supporting defendants' claim that their outstanding liabilities minimized their net financial worth. Where, as here, a witness is knowingly false in one part of his testimony, the jury may distrust other portions of his testimony as well. (*People* v. *Cook* (1978) 22 Cal.3d 67, 86 [148 Cal.Rptr. 605, 583 P.2d 130].) Thus, the jury as fact finder was "permitted to credit some portions" of Dr. Springer's testimony "and not credit others." (*People* v. *Williams* (1992) 4 Cal.4th 354, 364 [14 Cal.Rptr.2d 441, 841 P.2d 961].) Moreover, the jury could properly view with distrust the weak evidence of liabilities presented by Dr. Springer since it was within his power to produce stronger and more satisfactory evidence. (Evid. Code, § 412.)[11] Hence, as we shall explain in detail, although accepting parts of Dr. Springer's testimony that were not self-serving, the jury could reasonably disbelieve his self-serving assertions.

---

[11]"If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (Evid. Code, § 412.)

Dr. Springer testified the Springers owned an El Cajon residence with a $580,000 fair market value.[12] Dr. Springer testified there was little or no equity in the El Cajon residence. According to Dr. Springer, the El Cajon residence was subject to a $385,000 trust deed; a $98,000 second trust deed; and a $70,000 third trust deed also jointly encumbering the Springers' La Mesa condominium. However, Dr. Springer did not present documentary evidence of those three asserted trust deeds.[13] Indeed, Dr. Springer acknowledged having prepared on the previous day a handwritten note with a notation under a reference to the El Cajon residence stating: "Trust deeds, none."

Dr. Springer testified the Springers' La Mesa condominium was worth $175,000 and produced $950 monthly rent. Dr. Springer testified there was little or no equity in the La Mesa condominium. According to Dr. Springer, the La Mesa condominium was subject to a $60,000 first trust deed with a $715 monthly payment; a $25,000 second trust deed; a $10,000 third trust deed; and the $70,000 trust deed also encumbering the El Cajon residence. At the outset of the punitive damages phase of trial, Dr. Springer for the first time produced a copy of the first trust deed on the La Mesa condominium. However, Dr. Springer did not present documentary evidence of the other asserted encumbrances on the La Mesa condominium.

Dr. Springer testified he was one of two remaining partners in a limited partnership owning an office building worth about $500,000. Dr. Springer testified there was little or no equity in the limited partnership. According to Dr. Springer, the partnership's office building was subject to a $300,000 trust deed. However, Dr. Springer did not present documentary evidence of such asserted trust deed.

Dr. Springer testified he owned a Mercedes worth $15,000 subject to a $6,000 loan; a new Toyota Previa worth $27,000 subject to a $24,000 loan; and a 1984 Nissan worth $2,000. However, Dr. Springer did not present documentary evidence of the asserted loans.

Dr. Springer produced documentary evidence indicating his medical practice was worth $150,000, although when testifying he asserted its value was less. Dr. Springer also testified he had a $3,000 bank account and a life insurance policy with a $4,000 residual value. Dr. Springer further testified Mrs. Springer owned jewelry worth $5,000.

[12]Dr. Springer testified variously that the El Cajon residence was worth $550,000 and $580,000. Although stating the El Cajon residence was listed for sale, Dr. Springer did not produce documents indicating the listing price.

[13]We note Dr. Springer produced a document suggesting the El Cajon residence was formerly encumbered by a $280,000 first trust deed.

Finally, Dr. Springer testified Laser Center owned three lasers purchased for $25,000 each and a laser extension bought for $2,000. According to Dr. Springer, the three lasers were presently worth less than $5,000 each and the laser extension worth $2,000. However, Dr. Springer did not present supporting documentary evidence of the lasers' assertedly reduced value. Dr. Springer also acknowledged having performed the laser procedure on about 300 people (including 120 for cellulite), but claimed the net financial return from the total laser endeavor was about zero.

In sum, Dr. Springer admitted the Springers jointly owned assets worth at least $1,126,000.[14] Plaintiffs concede Dr. Springer presented credible evidence of $260,000 in first mortgages against the two residential properties. Hence, viewed in the light most favorable to the judgment, the evidence established that the Springers' net worth was $866,000.

At oral argument defendants contended that—even accepting the $866,000 figure as the Springers' net worth—the $200,000 total punitive damages award against the Springers ($125,000 against Dr. Springer and $75,000 against Mrs. Springer) was excessive as a matter of law as representing about 25 percent of such net worth.[15] However, contrary to defendants' suggestion, case law has not established any specific numerical percentage of net worth as constituting the upper permissible limit for the amount of a punitive damages award. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 388-392 [202 Cal.Rptr. 204].) In *Devlin* we examined numerous appellate decisions in an attempt to discern a single formula for calculating punitive damages but were "unable to find that formula." (*Id.* at p. 388.) We stated: "Instead of making a mathematical breakthrough we discovered what everyone probably already knows: the formula does not exist. And, we have concluded, that is properly so." (*Ibid.*)[16] We then proceeded to apply in the "customary manner" the "usual factors recited by appellate courts" in reviewing punitive damages awards, to

---

[14]Although the record suggests the Springers owned assets worth $1,151,000, for purposes of this analysis we adopt the lower figure of $1,126,000 used by plaintiffs.

[15]More precisely, the $200,000 total punitive damages award against the Springers represented about 23.1 percent of their $866,000 net worth.

[16]In *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.*, *supra*, 155 Cal.App.3d 381, we observed: "The process through which a fact finder finds punitive damages is somewhat contradictory. On the one hand, the court or jury must be sufficiently disturbed to conclude the defendant must be punished. On the other hand, although outraged, the fact finder cannot be vindictive. The channeling of just the correct quantum of bile to reach the correct level of punitive damages is, to put it mildly, an unscientific process complicated by personality differences. Conduct which one person may view as outrageous another may accept without feeling, depending on such diverse characteristics as an individual's background, temperament and societal concerns. The process is further complicated by the lack of objective criteria from either the Legislature or the courts as to 'how much' is necessary to punish and

wit, "the nature of the defendant's acts, the amount of compensatory damages awarded and the wealth of the defendant. [Citation.]" (*Id.* at pp. 388-389.)

On this record we cannot conclude the $200,000 total punitive damages award against the Springers was excessive. Defendants' conduct in defrauding persons seeking professional medical treatment was reprehensible. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d at pp. 389-390.) Punitive damages of $200,000 were less than three times the $64,325 compensatory damages awarded. (*Id.* at p. 390.)[17] Further, the $200,000 total punitive damages award against the Springers left them with $666,000, almost 77 percent of their demonstrated net worth. (*Id.* at pp. 391-392.)[18] In light of the evidence in this case, the $200,000 total punitive damages award against the Springers fell within the range of reasonableness. (*Id.* at p. 391.) Such award did not destroy the Springers but instead was consistent with a general goal of punitive damages to "punish wrongdoing and thereby to protect [the public] from future misconduct, either by the same defendant or other potential wrongdoers. [Citation.]" (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348]; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.)[19] Hence, the $200,000 total punitive damages award against the Springers was not excessive as a

deter." (*Id.* at p. 388.) We also stated: "The lesson we learned from parsing the cases is that the reason why there is no simple formula for calculating punitive damages is that there is no particular sum which represents the *only* correct amount for such damages in any given case. Instead, there is a range of reasonableness for punitive damages reflective of the fact finder's human response to the evidence presented." (*Id.* at p. 391, italics in original.)

[17]In *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d 381, we indicated that although punitive damages should bear a "reasonable relationship" to actual damages suffered, there was "no fixed ratio by which to determine the reasonableness of that relationship. [Citations.]" (*Id.* at p. 390.) We also stated: "In light of the circumstances of this case, we could not say as a matter of law that punitive damages equal to almost 27 times the award of compensatory damages were unreasonable. As concluded above, the calculation of punitive damages does not involve strict adherence to a rigid formula. It involves, instead, 'a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants. Juries within this framework have a wide discretion in determining what is proper. [Citation.]' [Citation.] Courts have affirmed punitive damage awards with a ratio of as high as 2000 to 1. [Citations.]" (*Ibid.*)

[18]In *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d 381, we acknowledged that the punitive damages award representing 17.5 percent of Kearny Mesa's annualized net worth was "somewhat greater than comparable ratios contained in the reported cases . . . ." (*Id.* at p. 391.) However, we concluded that "we cannot say these numerical differences mandate a finding of excessiveness." (*Ibid.*)

[19]The jury could also properly consider—in connection with evidence of defendants' net worth—the "profitability" of the Springers' misconduct and reasonably infer they fraudulently obtained about $300,000 from persons undergoing the laser procedure for cellulite. (*Adams* v. *Murakami, supra,* 54 Cal.3d at p. 116, fn. 7; *Kenly* v. *Ukegawa* (1993) 16 Cal.App.4th 49, 57-58 [19 Cal.Rptr.2d 771]; *Cummings Medical Corp.* v. *Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1299-1300 [13 Cal.Rptr.2d 585].) Dr. Springer

matter of law. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.*, *supra*, at p. 392.)

Finally, absent documentary evidence to the contrary, the jury could reasonably infer Laser Center owned laser equipment worth $77,000. Thus, in light of the relevant factors, the $25,000 punitive damages award against Laser Center was also not excessive as a matter of law. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.*, *supra*, 155 Cal.App.3d at pp. 388-392.)

Accordingly, we affirm the awards of punitive damages.

## C

### *Discovery Sanctions*

As a sanction for Dr. Springer's noncompliance with discovery, the court precluded defendants from introducing documentary evidence about Dr. Springer's purported effort to obtain FDA approval for use of his laser procedure to treat cellulite. The court also instructed the jury on various factual matters admitted by Dr. Springer. Defendants assert those rulings constituted prejudicial error. We disagree.

### 1

### *The Record*

On January 13, 1992, plaintiffs served defendants with a request to produce various documents. Among the requested documents were those pertaining to the laser equipment defendants used on plaintiffs including any material indicating whether defendants applied to the FDA for approval of the laser procedure for cellulite.

On April 15, 1992, defendants' counsel responded informally, providing copies of some requested documents with a statement Dr. Springer did not presently have other requested materials. Defendants did not produce any documents pertaining to the laser equipment used by defendants on plaintiffs or application for FDA approval.

On August 3, 1992, upon plaintiffs' request, the court ordered the Springers' depositions be taken on August 20, 1992. The court indicated the Springers' failure to appear on that date might result in "terminating sanctions."

---

testified that about 120 persons underwent defendants' laser procedure for cellulite removal at a price of $2,000 to $3,000 for each person.

On August 22, 1992, plaintiffs served defendants with notices to produce various documents at trial.

On August 24, 1992, the parties filed a joint disposition conference report. In that report defendants did not list any documents supporting their claims about the status of their purported pursuit of FDA approval of laser treatment for cellulite. The advance trial review conference orders indicated exhibits not listed on the joint disposition conference report were subject to exclusion at trial.

On September 2, 1992, the court ordered Dr. Springer to resume his deposition the next day and indicated that a referee would be appointed immediately to rule on evidentiary matters if Dr. Springer refused to answer.

On September 4, 1992, the court appointed a referee to mediate Dr. Springer's deposition.

On September 9 and 10, 1992, Dr. Springer testified at deposition. Dr. Springer testified that although at some time in the past he possessed documents pertaining to the laser equipment he did not search for such documents upon receiving the January 1992 request to produce. Dr. Springer also testified he had recently been unable to locate any such documents and believed they had been stolen on May 5, 1992. Dr. Springer further testified that neither before nor after plaintiffs' discovery request did he look for documents about application for FDA approval. According to Dr. Springer, at one time he had copies of written correspondence with the FDA and an independent review board in Northern California but believed those documents were among those stolen on May 5, 1992. Dr. Springer admitted he possessed requested documents about defendants' solicitations pertaining to the laser procedures performed on plaintiffs but had declined to produce them without "any particular reason."

On September 21, 1993, at the outset of trial, the court granted plaintiffs' motion *in limine* to exclude any mention of document theft. Based upon information discovered at Dr. Springer's deposition about his failure even to attempt to produce various requested documents, plaintiffs brought an *in limine* motion for evidence sanctions or terminating sanctions against defendants. (§ 2023.) The court reserved ruling on plaintiffs' motion until development of evidence on the issues raised.

On the first day of trial Dr. Springer testified that in January 1992—after receiving plaintiffs' request to produce various documents including materials pertaining to any applications for government approval of defendants'

laser technique—he had materials bearing on such applications, had chosen not to produce those materials, and they were ultimately stolen during a burglary on May 5, 1992. Dr. Springer also testified that during discovery he did not provide plaintiffs with an existing video involving the laser procedure. Further, although testifying that in January 1992 he possessed various articles establishing the fact stated in his literature that the laser had been approved for treating cellulite in every country of the world except the United States, Dr. Springer did not provide plaintiffs with those articles. After testifying he had not produced such articles at deposition because he could not find them, Dr. Springer then testified he presently had those documents in the courtroom. Finally, Dr. Springer testified that he indirectly applied for FDA approval through independent review boards in San Diego (June 1989) and Northern California (fall 1990). However, according to Dr. Springer, he did not have a copy of such application since it had been stolen.

On the second day of trial, plaintiffs renewed their motion for discovery sanctions. Dr. Springer appeared in court with various documents he had not earlier produced. Dr. Springer asserted such documents were responsive to plaintiffs' earlier discovery requests and notice to produce at trial. Among those documents was correspondence with a federal employee in the Health and Human Services Department's radiation biology branch. The court told defense counsel it was "a total reprehensible violation of this court's rules, practices, and policies for a litigant to withhold documentation that is the subject of discovery and then surprisingly and unexplainedly find them during the trial." The court also stated: "That's not the way we try cases here, Dr. Springer, and your failure to comply or to establish any basis for refusing to comply with legitimate timely discovery requests subject you to sanctions. Your production of those documents at this stage of the game raises serious questions of propriety . . . ."

Plaintiffs sought an issue sanction (§ 2023, subd. (b)(2)) ordering that it be taken as established in the lawsuit that Dr. Springer never applied to any organization in the United States for FDA approval of use of his laser procedure to treat cellulite. When the court asked defendants' counsel for documentary evidence of a pending application to the FDA for approval of the laser treatment, Dr. Springer asked if he could answer the question. After defense counsel indicated no objection to Dr. Springer conversing directly with the court, Dr. Springer addressed the court and was questioned by the judge. During that colloquy Dr. Springer admitted: before January 1990 there was no application with the FDA; between January and September 1990 Dr. Springer's application for approval through an independent review board at a San Diego hospital was pending; in September 1990 the hospital declined to permit Dr. Springer to do a laser study there; upon contacting an

independent review board in Northern California, Dr. Springer learned the biggest issue was insurance and thus declined to pursue approval there; at time of trial there was no "formal" application pending for FDA approval for use of laser treatment for cellulite and no application sanctioned by any independent medical group; and Dr. Springer did not have any empirical data to support the representation that more than 23,000 people were treated with a "mid-level" laser in Europe and most had no reoccurrence.

After conversing with Dr. Springer, the court imposed an evidence sanction (§ 2023, subd. (b)(3)) for defendants' noncompliance with plaintiffs' earlier discovery request to produce documents pertaining to Dr. Springer's purported application for independent review board approval of the laser treatment for cellulite. Specifically, the court prohibited defendants from introducing any such documents into evidence. The court also imposed an issue sanction for defendants' misuse of the discovery process, directing plaintiffs' counsel to reduce to writing Dr. Springer's judicial admissions of various facts. The court later used the resulting document as a special jury instruction on Dr. Springer's factual admissions.

2

*Analysis*

(a)

*Evidence Sanction*

■ Defendants contend the court erred in imposing the evidence sanction prohibiting them from presenting to the jury evidence they sought independent review board approval of the laser procedure for treatment of cellulite. Defendants contend such drastic sanctions were not permissible in the first instance since plaintiffs waived their discovery demand by not earlier bringing a motion to compel a response to their request for production. (§ 2031, subd. (k).) According to defendants, plaintiffs should have sought an order compelling a response to such request and then, if defendants did not obey that order, seek additional sanctions including "evidence sanctions" or a "terminating sanction." In sum, defendants assert the court should have permitted them to present evidence of the subject matter of the "stolen" documents through examination of Dr. Springer with cross-examination by plaintiffs. However, in light of Dr. Springer's failure to respond and produce documents during discovery, we conclude the court properly imposed sanctions precluding defendants from introducing evidence about his purported effort to obtain approval for use of defendants' laser procedure to remove cellulite.

■ "Discovery sanctions 'should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery.' [Citations.] ' "The trial court has a wide discretion in granting discovery and . . . is granted broad discretionary powers to enforce its orders but its powers are not unlimited. . . . [¶] The sanctions the court may impose are such as are suitable and necessary to enable the party seeking discovery to obtain the objects of the discovery he seeks, but the court may not impose sanctions which are designed not to accomplish the objects of discovery but to impose punishment. [Citations.]" ' [Citations.]" (*Laguna Auto Body* v. *Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 487-488 [282 Cal.Rptr. 530]; accord, *Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 35 [9 Cal.Rptr.2d 396].) " 'The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action. [Citations.] Only two facts are absolutely prerequisite to imposition of the sanction: (1) there must be a failure to comply . . . and (2) the failure must be wilful [citation].' [Citation.]" (7 Cal.App.4th at p. 36.)

■ Dr. Springer did not formally reply to plaintiffs' timely and duly served request to produce various documents including those pertaining to the issue of application for FDA approval of use of the laser procedure to remove cellulite. Further, although initially testifying he neglected discovery until a burglary precluded compliance, Dr. Springer later brought some of the purportedly stolen documents to trial. Moreover, after twice ordering Dr. Springer to complete his deposition, the court ultimately appointed a referee to mediate the final deposition session. Hence, this record supported a finding defendants willfully failed to comply with discovery requirements. (*Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns, supra*, 7 Cal.App.4th at p. 36.)

"The court may impose an evidence sanction by an order prohibiting any party engaging in the misuse of the discovery process from introducing designated matters in evidence." (§ 2023, subd. (b)(3).) Defendants' failure to respond to an authorized method of discovery constituted misuse of the discovery process. (§ 2023, subd. (a)(4).) As we shall explain, notwithstanding the language of section 2031, subdivision (k),[20] under the circumstances here the court properly imposed the evidence sanction without a prior order to compel defendants' compliance with discovery. (*Do It Urself Moving &*

---

[20]Section 2031, subdivision (k), provides in part: "The party making the demand may move for an order compelling response to the inspection demand. The court shall impose a monetary sanction under Section 2023 against any party, person, or attorney who unsuccessfully makes or opposes a motion to compel a response to an inspection demand, unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust. If a party then fails to obey the order

*Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns, supra,* 7 Cal.App.4th at pp. 35-37.)

In *Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns, supra,* 7 Cal.App.4th 27, the appellate court rejected contentions similar to defendants' that plaintiffs were required to obtain an order to compel compliance with discovery before seeking sanctions more drastic than monetary sanctions. (*Id.* at pp. 35-37.) The appellate court observed: "[W]hile the cases and treatises have interpreted the Civil Discovery Act of 1986 (§ 2016 et seq.), and the statutory scheme which preceded it, to require that, prior to the imposition of sanctions harsher than monetary sanctions, a party must have disobeyed a court order compelling discovery [citations], these authorities are distinguishable from the circumstances of the case at bench. Here, it is conceded that plaintiffs are unable to provide the promised items of discovery. Under the circumstances of this case, a warning to plaintiffs, in the form of a formal order to comply, would have been futile. [Citation.]" (*Id.* at pp. 35-36.) Requiring plaintiffs here to seek a formal order to compel defendants to comply with discovery would have been similarly futile since Dr. Springer had claimed the requested documents were stolen. Further, the evidence sanction actually imposed was not punitive but instead reflected the court's attempt to "tailor" the sanction to the harm caused by the withheld discovery. (*Id.* at p. 36.) Moreover, the question before us is not whether the superior court should have imposed a lesser sanction but rather "whether the trial court abused its discretion by imposing the sanction it chose. [Citation.]" (*Id.* at pp. 36-37.) Imposition of a lesser sanction here would have permitted defendants to benefit from their withholding of discovery by forcing plaintiffs "to proceed to trial without the benefit of the bargained-for evidence." (*Id.* at p. 37.)

In sum, the superior court acted within its discretion in imposing an evidence sanction tailored to defendants' particular discovery misuse by precluding them from introducing evidence pertaining to their purported effort to obtain approval for use of their laser procedure in the United States to remove cellulite. (*Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns, supra,* 7 Cal.App.4th at p. 37; § 2023, subds. (a)(4) & (b)(3).)

(b)

*Issue Sanction*

In implementing an issue sanction imposed for defendants' misuse of the discovery process, the court instructed the jury: "There is no application

---

compelling a response, the court may make those orders that are just, including the imposition of an issue sanction, an evidence sanction, or a terminating sanction under Section 2023."

pending before the Food and Drug Administration seeking approval by Roy C. Springer, M.D., or anyone, for the use of low-level laser treatment of cellulite, nor has there ever been. No independent review board has ever sanctioned Dr. Springer's works in the area of low-level laser treatment of cellulite. Dr. Springer has no empirical data substantiating the claim made in his brochure, Exhibit One, that over 20,000 people have been treated for cellulite in Europe. Dr. Springer has no empirical data substantiated in his brochure, this Exhibit One, that there is little or no cellulite in the people treated in Europe."

■ Defendants attack that special jury instruction as an assertedly improper judicial finding of fact. According to defendants, even if the evidence sanction were valid, the court violated their due process rights by also imposing an issue sanction denying them the opportunity to present to the jury one of the most significant aspects of their case and instead invading the jury's exclusive province to resolve factual matters. Defendants also contend the special jury instruction in combination with the evidence sanction effectively constituted an improper "terminating sanction" in the first instance. In sum, defendants fault the court for transforming a portion of Dr. Springer's testimony outside the jury's presence into findings of fact embodied in the special jury instruction. Defendants thus contend by making factual findings and instructing the jury with those findings the court violated their constitutional right to have the jury determine all facts of the case. However, on this record the special jury instruction did not constitute an improper judicial finding of fact but instead implemented an issue sanction properly imposed for defendants' misuse of the discovery process.

"The court may impose an issue sanction ordering that designated facts shall be taken as established in the action in accordance with the claim of the party adversely affected by the misuse of the discovery process." (§ 2023, subd. (b)(2).) As detailed above, the record amply supported a finding defendants misused the discovery process by willfully failing to respond to plaintiffs' authorized discovery request. (*Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns, supra,* 7 Cal.App.4th at p. 36; § 2023, subd. (a)(4).)

The record indicates Dr. Springer initially testified that through independent review boards he indirectly applied for FDA approval of the laser procedure to remove cellulite; at one time he had documents pertaining to such purported application but chose not to produce them; and the application was later stolen so he no longer had a copy. However, on the next day of trial, Dr. Springer appeared in court with some of the purportedly stolen documents. After Dr. Springer then made various factual admissions, the

court decided to impose an issue sanction and implemented such sanction by instructing the jury on those admitted facts.

We reject defendants' contention the special instruction implementing the issue sanction improperly embodied judicial findings on disputed facts. The challenged instruction simply recited four facts admitted by Dr. Springer on the record directly to the court. Under those circumstances, the instruction was proper as stating facts no longer in dispute and upon which reasonable minds could not disagree. (*Howard* v. *Global Marine, Inc.* (1972) 28 Cal.App.3d 809, 813 [105 Cal.Rptr. 50].)[21] Further, the court could properly impose the issue sanction without a prior order compelling defendants to comply with discovery since, as discussed, requiring plaintiffs to seek such order would have been futile in light of Dr. Springer's claim the requested documents had been stolen. (*Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns, supra*, 7 Cal.App.4th at pp. 35-36.) Moreover, the combination of the evidence sanction and the jury instruction implementing the issue sanction did not constitute a "terminating sanction."[22] Instead, as discussed, those discovery sanctions involved only matters plaintiffs had tried to prove through the impeded discovery and were properly tailored to the specific harm caused by such withheld discovery. (*Id.* at p. 36.) Imposing lesser sanctions would have forced plaintiffs to go to trial without the benefit of bargained-for evidence. (*Id.* at p. 37.) In sum, the superior court acted within its discretion in imposing the issue sanction tailored to the defendants' particular discovery misuse and in implementing that sanction by instructing the jury that various facts should be taken as established against defendants. (*Ibid.*; § 2023, subds. (a)(4) & (b)(2).)

Finally, even if we deemed the challenged special jury instruction to be error, we would conclude defendants suffered no prejudice since on this record it is not reasonably likely an outcome more favorable to defendants would have resulted absent any such error. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1069-1070 [232 Cal.Rptr. 528, 728 P.2d 1163]; *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr.

---

[21]"The trial court should remove an issue from the jury's consideration only when any other determination would be so lacking in evidentiary support that the trial court would be impelled to set it aside as a matter of law [citation] . . . ." (*Howard* v. *Global Marine, Inc., supra*, 28 Cal.App.3d at p. 813.)

[22]Section 2023, subdivision (b)(4), provides:

"The court may impose a terminating sanction by one of the following orders:

"(A) An order striking out the pleadings or parts of the pleadings of any party engaging in the misuse of the discovery process.

"(B) An order staying further proceedings by that party until an order for discovery is obeyed.

"(C) An order dismissing the action, or any part of the action, of that party.

"(D) An order rendering a judgment by default against that party."

355, 582 P.2d 946]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In light of the properly imposed evidence sanction, there was no conflicting evidence on the instructed issues. Further, there is no indication that argument by plaintiffs' counsel exacerbated the instruction's effect; the jury did not seek rereading of the instruction; the jury's special verdict was unanimous on almost all issues; and there is no suggestion other instructions were erroneous. (*LeMons* v. *Regents of University of California, supra,* at p. 876.)

## D

### *Exclusion of Testimony of Defense Witnesses*

At trial defendants sought to present three witnesses (Pont, Willis and Cardell) to testify they told defendants they were personally satisfied with defendants' laser treatment to reduce their cellulite. Defendants asserted those witnesses' statements to defendants were relevant to the issue of defendants' mental state for fraud as tending to show that defendants' representations about past successes with the laser procedure were made in good faith. The court granted plaintiffs' motion to preclude those three defense witnesses from testifying about their personal satisfaction with the results of the laser procedure performed by defendants. (Evid. Code, § 352.)

■ Defendants contend the court prejudicially erred in excluding the proffered testimony of Pont, Willis and Cardell that they received positive results from defendants' treatments. Defendants assert such evidence was properly offered to show that the success of the laser procedure on some patients' cellulite tended to show defendants' representations about the procedure were made in good faith. We find no error.

The court excluded Cardell's testimony since she underwent the laser procedure after plaintiffs and thus her satisfaction could not have influenced defendants' mental state when they made representations to plaintiffs. The court also declined to permit Willis and Pont to testify that their satisfaction justified defendants' representations of results. The court observed that— although beginning the laser treatment before plaintiffs—Willis and Pont had not received enough treatment to have influenced defendants' state of mind by the time of defendants' representations to plaintiff Roosdahl. The court also stated the statistical weight of the experience of Willis and Pont was slight since they were only two patients among the dozens treated before

plaintiffs.[23] On this record we cannot say the court abused its discretion under Evidence Code section 352 in excluding the proffered testimony of the three defense witnesses.

The issue was whether defendants made various bad faith misrepresentations to plaintiffs involving FDA approval of use of the laser procedure to remove cellulite and the likelihood of successful results based in part on past experience in Europe. The issue was not whether the laser procedure worked to remove cellulite.[24] However, defendants implicitly acknowledge they proffered the testimony of Pont, Willis and Cardell in part to prove the laser procedure in fact worked for most cellulite patients.[25] Further, as the court properly found, in light of the dates those three witnesses underwent the laser procedure, it was unlikely any statements of satisfaction they made could have influenced defendants' mental state in making representations to plaintiffs. Moreover, as the court also properly found, evidence of such statements of satisfaction could not support a reasonable belief by defendants in the procedure's medical value since the three proffered witnesses did not represent a statistically significant number of patients. In sum, on this record the court could reasonably conclude any probative value of the proffered witnesses' statements of satisfaction would be substantially outweighed by the probability that admission of such evidence would confuse the issues and mislead the jury. (Evid. Code, § 352.) Hence, the court properly excluded the proffered testimony of Pont, Willis and Cardell.

## DISPOSITION

The judgment is affirmed.

Nares, J., and McDonald, J., concurred.

---

[23]The court also indicated concern that due to the physician-patient privilege Willis and Pont had not been identified during discovery.

[24]As noted by plaintiffs in objecting to the proffered testimony of Pont, Willis and Cardell, those witnesses were not qualified to render expert medical opinions about the efficacy of the laser procedure in removing cellulite.

[25]In their opening brief defendants assert "the witnesses' testimony was not offered *solely* to prove that the treatment in fact worked for most patients." (Italics added.)