Filed 11/25/14  Oiye v. Fox CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LAUREN OIYE, | H038573 & H038410 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 1-10-CV173255) |
| v. | |
| JAMES DANIEL FOX, | |
| Defendant and Appellant. | |

### INTRODUCTION

Defendant James Daniel Fox appeals from a judgment entered after a jury returned a verdict in favor of plaintiff Lauren Oiye on claims relating to defendant's many years of sexual abuse of plaintiff.  On appeal, defendant challenges some of the trial court's evidentiary rulings, the adjudication of the fraudulent transfer claim, and the orders on the costs and attorney fees.  We find no error and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was friends with defendant's daughter, when the girls were teenagers. The girls had met through a swim program, and plaintiff spent a lot of time with defendant and his family.  One day in 2001, when plaintiff was 13 years old, she was at defendant's home when he started kissing her neck.  He then carried her to his daughter's bed and touched her in a sexual manner.  Defendant was in his early 40's at the time. Defendant's sexual advances continued from that day forth.  Plaintiff estimated that when

she was in the eighth grade, she had sex with defendant a few times a week.  When plaintiff was in high school, she had sex with defendant almost every day.  During these years, defendant told plaintiff that he loved her, and he spent time with her.  He would often give her rides to and from school and swim practice and would come to her high school to have lunch with her.  He also bought her gifts such as jewelry, clothing, and a cell phone.

After plaintiff turned 18 years old, the sexual relationship continued.  Defendant told her that she could not tell anyone that their relationship had started before she was 18 years old.  Plaintiff told other people, including her friends and therapists, that her relationship with defendant began after she turned 18.  Plaintiff developed an eating disorder, and in 2007, she sought treatment for her condition at Ocean Air and UCLA medical facilities.  Both of these facilities were located in Southern California.  Defendant visited her every weekend and would often attend her therapy sessions.  When she returned to the Bay Area, plaintiff got an apartment two blocks away from defendant's home.  Initially, he paid her rent.  During that time, she saw defendant "[a]ll the time," and they had a sex once or twice a week.  In 2008, when plaintiff was 20 years old, she entered another medical facility, Lucile Packard.  Defendant visited her almost every day.  In 2009, plaintiff entered a third medical facility, Alta Bates.  Around this time, plaintiff and defendant met less frequently.  She met with defendant once or twice a week.  The sexual relationship ended around April 2009, when plaintiff was 21 years old.

In late 2009, plaintiff filed a report with the San Jose Police Department, alleging that defendant sexually molested her.  In April 2010, defendant was charged with and pleaded no contest to one felony count of lewd contact with a child under the age of 14 (Pen. Code, § 288, subd. (a)) and two felony counts of lewd touching of a child who was 14 or 15 years old and 10 years younger than the defendant (Pen.Code, § 288, subd. (c)(1)).  Defendant was sentenced to six years in prison.  He was ordered to pay $600,000 in restitution.

In May 2010, plaintiff filed a civil suit against defendant. Her first amended complaint alleged childhood sexual abuse, sexual assault and battery, false imprisonment, negligent infliction of emotion distress, intentional infliction of emotional distress, negligence, and fraudulent transfer. Plaintiff claimed that defendant began sexually molesting her when she was 13 years old and had "continued to sexually abuse, molest, assault and battery [*sic*] Plaintiff for the next nine years through and up to April, 2009, when plaintiff was age 21." Plaintiff also alleged that shortly after defendant was arrested, he transferred his Flannery Street residence to his living trust for the purpose of hindering, delaying, or defrauding plaintiff.

Plaintiff alleged that she sustained psychological, physical, and emotional injuries from the years of abuse. She sought damages representing her past and future medical expenses and also past and future general damages for pain and suffering, and mental, physical, and emotional distress, in amounts according to proof. Additionally, she requested punitive damages, in an amount according to proof. The complaint also prayed for an order declaring the transfer of the Flannery Street property void and an order compelling defendant to account for all income or rentals received from the property since transferring it to his living trust.

During discovery, plaintiff identified all her treatment/care providers and produced copies of medical bills that she had incurred. Plaintiff disclosed Dr. Lynn Ponton as her expert witness to testify about "sexual abuse, causation, damages, including, . . . plaintiff's past illnesses, . . . plaintiff's prognosis and necessary future medical and mental health care, and the necessity and reasonableness of her past care and treatment as well as the charges for that care and treatment." In December 2011, defendant conducted a deposition of Dr. Ponton. Defendant also deposed plaintiff on January 3, 2012.

The matter proceeded to trial on January 9, 2012. During the pre-trial motions, defendant filed a motion in limine to preclude plaintiff from "introducing, mentioning or claiming any economic or noneconomic damages" at trial. Defendant claimed that at

3

plaintiff's deposition, counsel objected to every inquiry on damages and that plaintiff refused to answer such questions. He also claimed that plaintiff failed to produce any documents that were requested pursuant to the deposition notice. At the deposition, defense counsel asked plaintiff about the damages she was seeking. Plaintiff's counsel objected to the questions and plaintiff answered that she did not know. Defendant did not file a motion to compel. He nonetheless argued that preclusion sanctions were appropriate because plaintiff's conduct at her deposition amounted to discovery abuse that left defendant with "essentially no discovery responses or information of damages in order to assess Plaintiff's claim." (Emphasis omitted.) The trial court denied the motion, explaining that such sanctions were too drastic given that there was no motion to compel and there were no extraordinary circumstances warranting such preclusion.

During her case in chief, plaintiff presented evidence that she was repeatedly sexually molested and manipulated by defendant starting from the age of 13 and that she suffered from injuries as a result. As evidence of defendant's liability, plaintiff submitted the complaint filed in defendant's criminal case, a transcript of a pretext phone call between plaintiff and defendant, in which plaintiff mentioned that the molestation began when she was 13 years old, and the clerk's minutes from when he pleaded no contest to child molestation charges.

As to damages, plaintiff claimed past and future economic and past and future noneconomic damages. As evidence of her past economic damages, plaintiff submitted billing statements from Alta Bates, which totaled $81,565.84 for the treatment that she had received.[1]

---

[1] Defendant or defendant's insurance had covered plaintiff's medical expenses incurred from treatment facilities that plaintiff entered before 2009. The trial court thus specified that "[s]o as for Ocean Air, UCLA, and Lucile Packard, those bills cannot be claimed as damages. Alta Bates can be collected as damages and presented."

4

As evidence of future economic damages, plaintiff presented the testimony of expert Dr. Ponton. The parties had agreed before trial that Dr. Ponton would testify via videotaped deposition. Prior to presenting the videotaped deposition to the jury, defendant objected to portions of Dr. Ponton's testimony regarding plaintiff's future medical expenses, on the ground that plaintiff did not establish that Dr. Ponton was qualified to testify about the costs of medical care and treatment. The trial court sustained the objections. However, the court allowed plaintiff to call Dr. Ponton into court to provide foundational testimony on her qualifications regarding billing practices and the costs of medical care. The court deferred its decision on whether to allow or deny Dr. Ponton's testimony on future medical costs pending her testimony. The next day, Dr. Ponton appeared in court to testify about her qualifications. The court found that she was qualified to testify about billing practices and costs of medical care, and it allowed her to testify on those topics.

Dr. Ponton opined that plaintiff would need future medical care and gave estimates for the reasonable costs of future medical care. Dr. Ponton testified that plaintiff would need individual psychotherapy about two to four times per month for the next six years. Dr. Ponton estimated the cost of psychotherapy would range from $36,000 to $72,000. She also testified that plaintiff would need hospitalization once or twice in the upcoming years, which ranged from $150,000 to $600,000. Lastly, Dr. Ponton testified that plaintiff would need outpatient treatment for eight months, which ranged from $120,000 to $240,000.

Plaintiff also presented evidence of noneconomic damages. Plaintiff testified as to how she developed an eating disorder as a result of defendant's conduct. She testified that she began binging and purging when she was 19 years old and was 15 pounds underweight. She also talked about the time she spent at several treatment facilities, starting from 2007. At those facilities, she was diagnosed with and treated for anorexia, post traumatic stress disorder (PTSD), and depression. Plaintiff underwent intensive

5

therapy, took medication, and stayed at residential treatment facilities for months at a time. Additionally, plaintiff presented Dr. Ponton's videotaped deposition testimony, in which she talked about plaintiff's psychological injuries and the emotional losses. Based upon her review of plaintiff's medical history and several interviews with plaintiff, Dr. Ponton opined that plaintiff suffered loss of identity, relationships with her parents and friends, sexuality, and control over her own life.

Lastly, regarding the fraudulent transfer claim, plaintiff submitted evidence to prove that defendant transferred property to his living trust in order to hinder or delay payment of damages owed to plaintiff. Specifically, plaintiff showed evidence that the timing of the property transfer coincided with defendant's criminal case proceedings. In December 2009, defendant was arrested and the district attorney filed a felony complaint against him. While defendant was out on bail, in February 2010, he transferred his property to his living trust. Plaintiff submitted into evidence a copy of the trust transfer grant deed, signed by defendant in February 2010. Thereafter, in April 2010, defendant pleaded no contest to three counts of lewd contact with a minor. In addition to the transfer deed, plaintiff also submitted a portion of defendant's deposition in which he admitted that he transferred property partly in response to the criminal case.

In his case-in-chief, defendant presented evidence that plaintiff's injuries were due to other factors such as prior sexual molestation, a bad relationship with her parents, and a bad relationship with her swim coach. Defendant called expert Dr. David Kann, who opined that there were multiple risk factors for developing an eating disorder and that there was no sole factor contributing to her injuries. Defendant also submitted into evidence photographs depicting plaintiff having fun with friends and boyfriends. These photographs were offered to contradict her claim that she suffered pain and isolation. In closing arguments, defendant argued that his no contest plea to the childhood sexual abuse charges did not mean he was admitting guilt, thus, the plea did not establish liability. Additionally, defendant argued that the relationship was consensual from when

6

plaintiff was 18 years old to 21 years old. As to plaintiff's claim for damages, defendant argued that the damages were caused by factors other than defendant's conduct.

The jury returned a verdict in favor of plaintiff on the childhood sexual abuse theory. The jury also found that defendant transferred property to the Fox Trust with the "intent to hinder, delay or defraud [plaintiff]." The jury awarded damages in the amount of (1) $41,000 for past economic loss (medical expenses), (2) $200,000 for future economic loss (medical expenses), (3) $250,000 for past noneconomic loss, and (4) $0 for future noneconomic loss. The jury found in favor of defendant on the sexual assault and battery, false imprisonment, negligent and intentional infliction of emotional distress, and negligence causes of action.

Following the trial, plaintiff filed a memorandum of costs, in which she requested $32,075.64. She later reduced the requested amount to $27,406.89. Plaintiff also moved for attorney fees in the amount of $518,568.75, pursuant to Code of Civil Procedure section 1021.4.[2] Defendant filed a "Motion for New Trial and/or Partial New Trial; and/or to Set Aside and Vacate Judgment and/or Enter Another and Different Judgment," in which he contested the trial court's decision to allow Dr. Ponton to testify live at trial regarding future economic damages and the court's finding on the fraudulent transfer claim. Defendant also filed an opposition to the motion for attorney fees, and he filed a motion to tax costs.

The trial court determined that plaintiff was the prevailing party and partially granted plaintiff's motion for attorney fees for the amount of $275,825. The court did not include the fees for the time spent on the appeal or include a lodestar multiplier. The court also partially granted defendant's motion to tax costs, awarding plaintiff $26,034.71 in costs. Lastly, the court denied defendant's motion for new trial and/or motion to vacate judgment.

_____

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

7

The amended judgment on the jury verdict was filed on May 22, 2012. The amended judgment included an order of attorney fees for $275,825, costs for $26,034.71, and an order to set aside a fraudulent transfer.

Defendant filed two timely notices of appeal. In H038410, defendant appeals the original judgment on the verdict, entered on February 7, 2012. In H038573, defendant appeals the May 22, 2012 amended judgment on the verdict, which included the order on the costs and fees. On January 14, 2013, this court ordered the two appeals considered together for purposes of briefing, oral argument and decision.

## DISCUSSION

### A. *The Trial Court Did Not Err in Denying the Motion in Limine to Preclude Plaintiff From Introducing, Mentioning, or Claiming Damages*

Defendant contends that the trial court erred by denying his motion in limine to preclude plaintiff from introducing, mentioning, or claiming any economic or noneconomic damages during her testimony at trial. He claims that plaintiff's refusal to answer questions or produce documents at her deposition was an abuse of discovery that left him with no information regarding damages to assess her claims or to prepare a defense at trial.

Defendant served a notice of plaintiff's deposition on November 23, 2011, which was close to the discovery cut-off date. The notice scheduled the deposition on December 7, 2011 and included 186 requests for production of documents. Plaintiff objected to the December 7 date due to the fact that plaintiff lived out of state and was unavailable for her deposition. The deposition was rescheduled to January 3, 2012.

At the deposition, plaintiff did not bring any documents. She also stated that she had not seen the notice of her deposition until the day of the deposition. Defense counsel asked plaintiff a series of questions about damages. Counsel asked: "Do you know what you're claiming damages for in this lawsuit?" Plaintiff's counsel objected on the grounds that the question was "Vague and ambiguous, calls for a legal conclusion." Defense

8

counsel then rephrased the question, "What type of damages are you seeking in this lawsuit, if you know?  After an objection on the same grounds, plaintiff answered, "I don't know specifically."  Defense counsel asked, "Are you seeking money to be reimbursed for medical treatment?"  Plaintiff's counsel objected again on the same grounds.  Defense counsel specified that he wanted to know "her general damages, whatever she knows, if she knows."  Plaintiff responded, "I don't"  Defense counsel asked, "Do you have any knowledge of what . . . amounts you're seeking?"  Plaintiff responded, "I don't."  Defendant did not file a motion to compel responses or documents pertaining to damages.

Defendant filed the motion in limine, seeking to preclude plaintiff from "introducing, mentioning or claiming any economic or non-economic damages" on the grounds that her refusal to answer questions or produce documents at her deposition was an abuse of discovery.  In opposition, plaintiff argued that defendant was already aware of her special damages, as he had personally accompanied her to hospital, she had identified all of her care/treatment providers and the amounts charged in her form interrogatory responses, and she had produced a copies of medical bills as a part of her discovery responses.  Plaintiff also argued that defendant had the opportunity to discover her general damages, but did not do so.  Additionally, she argued that the relevant information for her general damages claim had already been provided through pleadings and discovery.  As to her deposition, plaintiff argued that defendant's questions regarding damages at the deposition were unclear and vague.  As such, the questions were met with appropriate objections on the ground that they called for legal conclusions.  Furthermore, plaintiff raised several arguments about the service of the deposition notice.  First, she pointed out that the notice was served near the discovery cut-off date, which gave her a short amount of time to respond and produce all of the requested documents.  Second, she objected to the date proposed by defendant as she lived out of state, and was thus unavailable.  Plaintiff also argued that the 186 requests to produce documents at the

9

deposition were over burdensome and that she had appropriately objected to these requests. Lastly, she argued that defendant had not filed a motion to compel and that he was required do so before requesting evidentiary sanctions.

At the hearing, the court commented on defendant's request for production of documents that was served with the deposition notice: "It's a lot of them, You served them right before Thanksgiving during the holidays. And you asked for a depo to be taken December 7th. On November 23rd you sent [the notice of deposition], and you want these done by December 7th?" Although the trial court agreed with defendant that plaintiff should not have shown up to her deposition without any documents or without seeing the deposition notice, it nonetheless found that "looking at [the notice of deposition], and looking at the dates when it was served, and when you expected compliance. And just reading the sort of documents you want and how far back you want them from seems very unreasonable, extremely burdensome, given the small amount of time. If it were a regular discovery request they would have been given a lot more time." The court denied the motion in limine, explaining that "I should only do that when there's no motion to compel in extraordinary circumstances. . . . [¶] . . . [¶] So your request for preclusion sanctions is denied, based on the record that I have before me. I think that's much too drastic."

The trial court also addressed whether plaintiff refused to answer questions about damages at her deposition. The court asked plaintiff's counsel what damages she was seeking. Counsel responded that they were seeking special damages, which were the Alta Bates expenses, as well as general and punitive damages. As to general damages, the court observed that "there's no surprise there." Defense counsel replied "It's not that it's no surprise. [Plaintiff's counsel] wouldn't let her answer." The court found that defense counsel failed to ask more specific questions on general damages. It commented, "I don't think you went so far as to ask her other questions. You should have. And you should have made her answer those other questions, even if there was an objection in the

10

deposition." "Why didn't you ask something more specific? Did you miss work? Did you miss swim meets?" The court also observed that it did not see anywhere in the deposition transcript where plaintiff's counsel instructed not to answer a question. The court then reiterated that it was denying defendant's motion in limine to preclude plaintiff from testifying about her damages at trial.

At trial, plaintiff testified about her non-economic damages (i.e, pain and suffering, emotional distress, and psychological harm). She also talked about the medical care she received at numerous treatment facilities.

On appeal, we review the trial court's decision to impose or deny a discovery sanction for an abuse of discretion. (*Lee v. Lee* (2009) 175 Cal.App.4th 1553, 1559 (*Lee*).) Section 2023.030, subdivision (c) provides: "The court may impose an evidence sanction by an order prohibiting any party engaging in the misuse of the discovery process from introducing designated matters in evidence." Section 2023.010 lists examples of conduct amounting to misuses of the discovery process. These include "[f]ailing to respond to an authorized method of discovery" or "[m]aking an evasive response to discovery." (§ 2023.010, subds. (d) & (f).) "[A]bsent unusual circumstances, such as repeated and egregious discovery abuses, two facts are generally a prerequisite to the imposition of a nonmonetary sanction. There must be a failure to comply with a court order and the failure must be willful." (*Lee, supra,* at p. 1559.)

In exceptional cases, appellate courts have determined that evidentiary sanctions may be imposed without a prior court order compelling discovery and a subsequent failure to obey such an order. In *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1544-1546 (*Vallbona*), an appellate court rejected the contention that the plaintiffs had waived their discovery demand by not bringing an earlier motion to compel a response to their request for production. The court came to this conclusion despite the language of the applicable statute, which provided that if *after* a court orders a motion to compel and a party subsequently fails to obey the order, then the court may impose evidence

11

sanctions. (Former § 2031, subd. (k), as amended Stats. 1991, ch. 1090, repealed by Stats. 2004, ch. 182.) The appellate court concluded that evidence sanctions were properly imposed without a prior order to compel defendants' compliance with discovery where at trial the defendant doctor attempted to present evidence concerning certain documents, which he had failed to produce when formally requested and then later had claimed had been subsequently stolen. (*Vallbona, supra,* at pp. 1544-1546.)

In *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1452-1453 (*Pate*), plaintiffs had made several written pretrial requests for production of documents and had received written assurances from the defendant that all relevant documents had been produced. Plaintiffs had agreed to a request by the defendant to reopen discovery in exchange for further assurances. (*Ibid.*) Plaintiffs also had tendered all 719 documents they had copied from the defendant's files and again asked whether any other documents were in existence, and again received assurances from the defendant that there were no other documents to be discovered. (*Ibid.*) In its defense at trial, the defendant then attempted to introduce documents that had not been produced in discovery. (*Ibid.*) The appellate court determined that the evidence sanction was proper even though plaintiffs had not moved to compel further responses to their requests for production since they had received repeated assurances from defendant that all documents had been produced. (*Id.* at p. 1456.)

In contrast to *Vallbona* and *Pate*, defendant in this case had not been led to believe that the requested discovery did not exist or could not be produced. Here, plaintiff did not refuse or otherwise evade responding to deposition questions on damages. When defense counsel asked plaintiff questions about damages at her deposition, plaintiff's counsel objected on the ground that the question was vague and called for a legal conclusion as to the term, "damages." Counsel never specified what he meant by "damages," nor did he ask specific questions regarding her general damages. Plaintiff was never instructed not to answer these questions, and when she was asked about

12

"damages," she replied that she did not know. Given the form of question, the trial court could have reasonably concluded the term "damages" was vague and that plaintiff, a layperson, would not understand that term. Moreover, although plaintiff did not bring any of the requested documents to her deposition, defendant had made 186 requests for production of documents, which he served close to the discovery cut-off date. Under these circumstances, the trial court could have reasonably concluded that the requests were over burdensome and that plaintiff's objections were appropriate. Unlike *Vallbona* and *Pate*, plaintiff's testimony on damages at trial did not constitute unfair surprise. Plaintiff produced medical bills and the names of all her treatment providers in response to defendant's form interrogatories and other such discovery requests. She also mentioned her claim for general damages through her pleadings and discovery. Thus, in context, the trial court could have reasonably found that there were no "repeated and egregious discovery abuses" that would warrant the drastic sanction of evidence preclusion. (*Lee, supra,* 175 Cal.App.4th at p. 1559.) In this instance, even before the trial court could impose evidentiary sanctions, both an order compelling discovery responses and plaintiff's willful failure to comply with such an order were required. As defendant did not seek an order to compel discovery responses, there was no such order to compel here. Thus, the trial court did not abuse its discretion by denying evidentiary sanctions.

B. **The Trial Court did not Abuse its Discretion in Allowing Dr. Ponton's Live Testimony at Trial**

Defendant contends that the trial court erred by allowing Dr. Ponton to give live testimony at trial regarding the cost of future medical care and her qualifications to testify on that matter. Defendant asserts that allowing her live testimony was "unexpected and an unfair surprise," as it deprived defendant of any prior opportunity to investigate Dr. Ponton's claims or to bring in his own evidence regarding the cost of medical care.

13

Plaintiff had disclosed that Dr. Ponton would provide expert testimony on "sexual abuse, causation, damages, including, but not limited to, the nature and severity of the plaintiff's past illnesses, their cause, and plaintiff's prognosis and necessary future medical and mental health care, and the necessity and reasonableness of her past care and treatment as well as the charges for that care and treatment." The parties agreed that Dr. Ponton's deposition would be videotaped and could be used at trial. Nothing in the record indicates that there was an agreement that Dr. Ponton could not be called as a witness at trial.

At her deposition, Dr. Ponton testified that plaintiff would need future medical care, and she opined that costs could run from $320,000 to $480,000 for an eating disorder program, $36,000 to $72,000 for outpatient therapy, and about $240,000 to $480,000 for inpatient medical hospitalization.

Defendant filed "Objections Re: Video Recording of Lynn Ponton, M.D.," in which he objected to Dr. Ponton's testimony regarding the cost of future medical care. Defendant argued that plaintiff failed to lay a proper foundation regarding Dr. Ponton's qualifications to testify about the billings and costs of medical care. The trial court sustained defendant's objections, explaining that "My experience is doctors deal with the treatment of patients. They don't deal with the billing unless maybe they're a solo practitioner. . . . Generally, they don't do anything with billing, especially in large institutions. Additionally, the court sustained the objections, based on the mistaken belief that Dr. Ponton was not disclosed to discuss billing practices and estimating medical costs. After the court sustained the objections, plaintiff presented the videotaped deposition of Dr. Ponton, which excluded her testimony regarding the costs of future medical care.

The next day, plaintiff again raised the issue regarding Dr. Ponton's testimony on future medical costs, arguing that (1) Dr. Ponton was disclosed to testify about future medical costs and (2) she was qualified to provide that testimony. After reviewing the

14

expert witness disclosure, the trial court noted that "I, in part, was wrong in my ruling on the objection[s]. Part of it wasn't my fault because I didn't have the full disclosure as to what she was qualified to talk about. Part of the basis of my ruling on the objection[s] was that she wasn't disclosed as a person who would give such testimony regarding billings. Clearly she was." Defendant also acknowledged that Dr. Ponton had been disclosed to talk about future medical costs. As to Dr. Ponton's qualifications, the court allowed Dr. Ponton to come in the next day to provide foundational testimony. The court explained, "I want to be satisfied that she's qualified to give that opinion. Plus, I didn't allow her to do it in the deposition testimony that's played before the jurors. So I'm going to allow her to come in tomorrow." The court noted that if it found Dr. Ponton qualified to talk about billings and medical costs, it would allow her to testify in front of the jury as to her opinion of plaintiff's future medical costs.

Defendant requested an opportunity to rebut Dr. Ponton's testimony regarding future medical costs, in the event that the trial court found the doctor qualified to testify. The court denied defendant's request to supplement his expert disclosure, noting that plaintiff had disclosed that Dr. Ponton would discuss future medical costs. The court explained, "that should have been part of your disclosure. Or you should have supplemented it previously, especially after you heard her deposition testimony. . . . [¶] . . . [¶] You should have already had somebody in the event that it was going to be admissible."

Plaintiff called in Dr. Ponton to testify in person the next day. Outside the presence of the jury, counsel conducted a voir dire examination regarding her qualifications relative to billings and costs of future medical care. Based on Dr. Ponton's testimony, the trial court found her qualified to offer opinions on the reasonable cost of future medical care. At defense counsel's request, counsel again conducted a voir dire examination in the presence of the jury. Dr. Ponton then offered her opinion as to plaintiff's cost of future medical care, opining that costs could run from $320,000 to

15

$480,000 for an eating disorder program, $36,000 to $72,000 for outpatient therapy, and about $240,000 to $480,000 for inpatient medical hospitalization. The jury awarded plaintiff $200,000 for future economic loss (medical expenses).

On appeal, defendant argues that the trial court erred in allowing Dr. Ponton's live testimony because her testimony on future medical costs was an unfair surprise. Defendant contends that Dr. Ponton's live testimony regarding future medical costs and her background in billings and charges went beyond the scope of her deposition testimony. Thus, defendant had no notice or expectation that she would offer this testimony at trial. (See *McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 98; *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780 (*Easterby*).)

We review a trial court's ruling on the admissibility of expert testimony under the deferential abuse of discretion standard. (*Easterby*, *supra*, 171 Cal.App.4th at p. 778.) As a part of a expert witness disclosure, a party shall " ' "disclose the *substance* of the facts and the opinions to which the expert will testify, either in his witness exchange list, or in his deposition, or both." ' " (*Ibid.*; § 2034.260, subd. (c)(2).) "[T]he very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area." (*Bonds v. Roy* (1999) 20 Cal.4th 140, 146-147.) "When an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-examination or rebuttal." (*Id.* at p.147.) Thus, a party's expert generally may not offer testimony at trial that exceeds the scope of his or her deposition testimony if the opposing party had no notice or expectation that the expert would offer new testimony. (*Easterby*, *supra*, at p. 780.)

In this case, defendant's claim of surprise is unfounded. First, there was no dispute that Dr. Ponton had been disclosed to testify about future medical costs.

16

Additionally, defendant attended Dr. Ponton's deposition and heard her testimony regarding plaintiff's future medical care and costs. Her live testimony at trial did not materially differ from her testimony at her deposition. Therefore, defendant had the opportunity to investigate, find his own expert to respond with a competing opinion, and prepare a cross-examination for Dr. Ponton's testimony on future medical costs. As the trial court correctly stated, defendant should have prepared a rebuttal in the event that it overruled his objection.

Moreover, to the extent that defendant argues that the foundational testimony regarding Dr. Ponton's qualification constituted unfair surprise, plaintiff had disclosed information about the doctor's background and experience, including her curriculum vitae, in addition to disclosing that Dr. Ponton would testify to future damages. Thus, defendant also had an opportunity to investigate Dr. Ponton qualifications prior to trial.

Dr. Ponton's testimony was plaintiff's only evidence of her future economic damages. Had Dr. Ponton's testimony regarding future medical costs been precluded, plaintiff would not have been able to establish the future economic loss to which she was entitled. Under these circumstances, it was not an abuse of discretion to allow Dr. Ponton to testify in front of the jury regarding her qualifications and her opinions on future medical costs.

### C. *The Fraudulent Transfer Claim was Adjudicated*

Defendant argues that the amended judgment should be reversed as to the fraudulent transfer claim because that cause of action was not adjudicated. He asserts that there was no trial on this claim other than the single question on the special jury verdict regarding the property transfer. Defendant also asserts that after the verdict the trial court indicated that the parties could "either work out the remaining part of the trial for fraudulent transfer or set the matter for hearing."

Plaintiff's fraudulent transfer claim asserted that defendant had transferred his Flannery Street property on February 1, 2010 to the James D. Fox Trust for the purpose

17

of hindering, delaying, or defrauding plaintiff. Plaintiff claimed that the transfer of property coincided with his criminal case, as the transfer occurred between the time defendant was arrested in December 2009 and when he pleaded no contest in April 2010. At trial, plaintiff submitted as evidence the "Trust Transfer Grant Deed," which showed that defendant transferred the Flannery Street property to the James D. Fox Trust while he was out on bail on February 1, 2010. Additionally, plaintiff submitted portions of defendant's deposition. At the deposition, counsel asked defendant, "Why did you convey title of the house to the trust?" Defendant responded "Because I always needed to do financial planning for myself and I had never done it." Counsel then asked, "Had nothing to do with Lauren's case?" Defendant replied, "Lauren's case brought the realization to me that I needed to do financial planning."

The trial court properly instructed the jury on the elements of the fraudulent transfer claim. The court instructed that to establish the claim, plaintiff had to prove that: (1) she had a right to payment from defendant for damages, (2) defendant transferred property to his trust, (3) defendant transferred property with the intent to hinder, delay or defraud her, (4) she was harmed, and (5) defendant's conduct was a substantial factor in causing her harm. (Judicial Council of Cal. Civ. Jury Instns. (2014), CACI No. 4200; Civ. Code, § 3439.04, subdivision (a)(1).) The court also provided the jury with a special verdict, which asked "Did James Fox transfer property to the Fox Trust with the intent to hinder, delay or defraud Lauren Oiye?" The jury answered "Yes."

Defense counsel's declaration said that after the jury returned a verdict, the trial court convened with counsel for both parties and "indicated that the parties could either work out the remaining part of the trial for fraudulent transfer or set the matter for hearing."

On May 22, 2012, the trial court entered the amended judgment. The judgment was amended to include that "the court further finds that the transfer of an interest in the real property at 554 Flannery Street, Santa Clara from James Daniel Fox to James Daniel

18

Fox as the trustee of The James D. Fox Qualified Personal Trust was a fraudulent transfer and shall be set aside."

On appeal, defendant argues there was not a finding on every element of the fraudulent transfer claim, and therefore, the amended judgment on this cause of action was improperly entered. Defendant points to the fact that the trial court stated on the record that there were issues to work out with respect to this cause of action. However, nothing in the record shows that such a statement was made. Other than defense counsel's own declaration, there is no mention of further hearings on the fraudulent transfer matter. Defendant bears the burden of providing a record on appeal that is adequate to adjudicate his claims and support his contentions of error. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 149.) Defendant has not done so in this case. Even if the court indicated that there would be a further hearing, the fact that there was no further hearing held on the matter does not mean the judgment should be reversed.

Although the special verdict form specifically mentions only two elements of the claim (i.e., transfer of property and intent to hinder, delay, or defraud plaintiff), the jury's findings, taken as a whole, support the entry of judgment on this cause of action. As to the first element, right to payment, the jury awarded plaintiff damages totaling $491,000, establishing that plaintiff was entitled to payment from defendant. With respect to the second and third elements, transfer of property and intent, the jury made an express finding on the special verdict form that defendant transferred the property to his living trust with an intent to hinder, delay, or defraud payment of damages to plaintiff. As to the fourth element, harm, the jury's finding that she was entitled to damages, and that defendant transferred and hid assets to prevent collection establishes the requisite harm. Lastly, as to the fifth element, causation, the special verdict form specifically placed defendant's conduct at issue, as it asked the jury, "Did James Fox transfer property . . . ." The jury answered "Yes." Therefore, the jury found that defendant's conduct was a

19

substantial factor in causing plaintiff's harm. Because the fraudulent transfer claim was fully adjudicated, we find no reason to disturb the judgment.

## D. The Attorney Fees were Properly Calculated

Defendant argues that the trial court erred in granting $275,825 in attorney fees pursuant to section 1021.4.

Section 1021.4 provides: "In an action for damages against a defendant based upon that defendant's commission of a felony offense for which that defendant has been convicted, the court may, upon motion, award reasonable attorney's fees to a prevailing plaintiff against the defendant who has been convicted of the felony." "[A]n action for damages is 'based upon' the defendant's commission of a felony within the meaning of the statute if and only if the damages claimed by the plaintiff were caused by the same felonious criminal conduct for which the defendant was convicted." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1339.)

In plaintiff's motion for attorney fees pursuant to section 1021.4, she claimed that the trial court should award her $518,568.75 ($296,325 multiplied by a 1.75 lodestar multiplier) because defendant's felony child molestation offenses, for which he was convicted, was the basis for plaintiff's injuries. Attached to the motion was a declaration of plaintiff's counsel detailing the legal work and services completed by the attorneys, employee hours spent on certain tasks, and the hourly rates. Counsel submitted that "[a]t the regular hourly rates charged by each respective attorney, this time results in a total fee, before any lodestar adjustment, of $296,235." Lastly, counsel mentioned that "the firm's fees for the services rendered are contingent on the outcome of this litigation." Counsel did not provide details of the contingency fee agreement.

The trial court found that plaintiff was the prevailing party and awarded $275,825 in attorney fees. The court's order specified that it was granting "the amount of $275,825, which is the total amount requested after a reduction by the court of $17,500.00. The court denied the $17,500.00, which represents requested attorney's fees

20

for appellate court work."[3] The court also denied the lodestar multiplier, finding that "special factors do not exist that would justify an increase multiplier . . . ." In making this ruling, the court commented that "[s]he didn't prevail on all of [the causes of action], but she did prevail on some of them. And it's really hard in a case like this to sort of distinguish one [c]ause of [a]ction from another. And the damages that go along with the causes of action are so inter-related. I am not going to parcel out or divide between the issues. But on the same note, because I'm not doing that, I'm not going to add a multiplier." The court also noted that "part of the case was complex in trying to understand anorexia and [PTSD], and what that means when somebody has been molested. . . . [¶] As to the molestation, that party [*sic*] wasn't complicated . . . . [¶] Given the two, I think the number of hours spent was reasonable. And the hourly rate compensated the attorneys adequately."

### 1. Plaintiff was the Prevailing Party

First, defendant contends that the trial court erred in granting any attorney fees because plaintiff was not the prevailing party.

Section 1021.4 allows the trial court to award reasonable attorney fees to a *prevailing plaintiff* against a defendant who has been convicted of the felony. A trial court's award of attorney fees made pursuant to section 1021.4 is reviewed for an abuse of discretion. (*Sommers v. Erb* (1992) 2 Cal.App.4th 1644, 1652.)

Despite the jury's award of $241,000 for economic damages and $250,000 for noneconomic damages, defendant argues that he is the "prevailing party" because he had prevailed in the majority of the seven causes of action alleged against him and because plaintiff received a jury award considerably less than what she had sought.

Defendant cites to no authority in support of his contention that a "prevailing party" for section 1021.4 purposes means a party prevailing on the majority of the alleged

---

[3] We note that the total amount that plaintiff requested after a reduction by $17,500 would be $278,825 ($296.325-$17,500), and not $275,825.

21

causes of action and receiving all or most of the requested damages; nor is defendant's argument persuasive. Although plaintiff may not have prevailed on her alternative causes of action or received the full amount that she sought, the jury found in favor of plaintiff on the childhood sexual molestation claim, an act for which defendant had been convicted. As a result, the jury awarded her significant economic and noneconomic damages. Therefore, the trial court did not abuse its discretion in determining plaintiff to be the prevailing party in this action and in allowing attorney fees.

### 2. *The Trial Court did not Abuse its Discretion in Awarding Plaintiff Attorney fees in the Amount of $275,825.*

Alternatively, defendant argues that even if plaintiff was the prevailing party and was entitled attorney fees, she was only entitled to those fees related to the first cause of action. Defendant contends that the fee award of $275,825 represented nearly the "full amount requested by plaintiff's attorneys for the entire civil action," excluding the fees for appellate court work and the lodestar multiplier. He contends that the attorney fees must undergo some reduction based on plaintiff's partial success in the action, that the award amount was unreasonable and excessive as the attorneys took the case on a contingency fee basis, and that plaintiff failed to establish reasonable attorney fees.

For statutory attorney fees, the trial court uses a "lodestar" method to determine the amount of the award based on the time spent by counsel and the reasonable hourly rates. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134-1135.) "[T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill

22

justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Id.* at p. 1132.)

The lodestar method is used even if the prevailing party has a contingency fee agreement with his or her attorney. " 'It is well established that the determination of what constitutes reasonable attorney's fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citations.] . . . The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' [Citation.] Although the terms of the [contingency fee] contract may be considered, they 'do not compel any particular award.' [Citations.]" (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084,1096, see also *Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 519-521.)

Here, the trial court considered several factors such as the services and work provided to plaintiff, the hours spent on the case, the hourly rates, any delay in payment, the risks of taking on the case, the difficulty and complexity of the case, and the fact that the case was taken on a contingency fee basis. The court also took into account the nature of all of plaintiff's causes of action and decided that due to the fact that the alternative causes of action were so closely related to the child molestation cause of action, it would not divide the fees per issue. Defendant made no showing that any portion of the attorney fees were attributable solely to represent plaintiff on the non-prevailing claims. Given the nature of plaintiff's causes of action, the trial court acted reasonably in deciding not to divide the fees per issue and awarding the nearly the full amount requested (excluding the lodestar multiplier and the fees for appellate work). Moreover, the fact that trial court denied fees for appellate work and a lodestar multiplier,

23

and that it reduced the fee award from $518,568.75 to $275,825, demonstrates that it exercised its discretion in setting the award amount.

### E. There Was No Abuse of Discretion in Awarding Costs

Defendant also challenges the court's award of costs. He specifically contests the following cost items: (1) the videotaping costs of defendant's deposition, (2) the transcribing costs for the deposition of experts David Kan, Carl Lewis, and Lynn Ponton as well as videotaping and travel costs associated with Dr. Ponton's deposition (3) the cost for the pre-text phone call transcript, (4) the costs related to playing the videotaped deposition of Dr. Ponton at trial, and (5) the costs for several investigative subpoenas.

Section 1032, subdivision (b) provides that a "prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Section 1033.5, subdivision (a) identifies the specific items of cost that are allowable, and subdivision (b) specifies which cost are not allowable. However, an item not specifically allowable under section 1033.5, subdivision (a) nor prohibited under subdivision (b), may nevertheless "be allowed or denied in the court's discretion." (§ 1033.5, subd. (c)(4).) An award of costs shall be "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation," and shall be "reasonable in amount." (§ 1033.5, subds. (c)(2) & (3).) A verified cost memorandum is prima facie evidence that the prevailing party necessarily incurred the costs, expenses, and services listed. (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131.) If the cost items appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary. (*Ibid.*) " ' "Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion." [Citation.]' " (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 71.)

In her memorandum of costs, plaintiff listed several items of costs, which totaled $32,075.64. She later reduced the requested total costs to $27,406.89.

24

Defendant filed a motion to tax costs. However, our record only contains an "Amended Notice of Motion and Motion to Strike and/or Tax Costs" and his reply to plaintiff's opposition to the motion to tax costs. The record does not contain the "Memorandum of Points and Authorities," the "Declaration of Bradley Kass, Esq.," or any other evidence or arguments related to the motion.

Additionally, our review of the costs award is further complicated by the fact that there is no record of which costs items were allowed, reduced or disallowed by the trial court. At the hearing on costs, the court stated that "Now for the costs, we discussed that at length in chambers. I believe we agreed that the costs should be $26,034.71. But if either of you want to preserve any objections for the record, you should do so now." Defense counsel responded, "I mean, in light of the comparison to the other issues, we were just going to leave it on the papers. And we did discuss it. And that seems to be the figure we ended up with." The court noted, "And there were some reductions by Mr. Waslif." Defense counsel responded, "Correct, Your Honor." The court then stated it would award plaintiff $26,034.71 in costs. There was no further discussion regarding how the court determined the amount of costs. Additionally, the written order merely stated that "1. Defendants' motion is granted in part and denied in part; and [¶] 2. Costs are hereby awarded to Plaintiff, Lauren Oiye, in the amount of $26,034.71."

A fundamental rule of appellate review is that the appealed judgment or order is presumed to be correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) The appellant has the burden of overcoming the presumption of correctness. To meet that burden, the appellant must provide this court with an adequate record that demonstrates the alleged error and reasoned argument and legal authority on each point raised. (*Ibid*.) Failure to provide an adequate record on an issue requires that the issue be resolved against the appellant. (*Ibid*.)

In *Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816-817 (*Levy*), the record was silent as to the question of whether costs were allowed, reduced, or

25

disallowed.  The appellate court assumed the trial court in its sound discretion found the costs were excessive and should be reduced.  Thus, the appellant bore the consequences of failing to make a record.  (*Id.* at p. 817.)

Similarly, in this instance, nothing in the record shows which of plaintiff's claimed costs were allowed, reduced, disallowed, or how the court determined the total award amount.  Without such a record, we cannot determine whether the trial court abused its discretion in awarding these costs.  Thus, we presume the court, in its sound discretion, found that $26,032.71 be the appropriate amount of costs.  (*Levy, supra,* 4 Cal.App.4th at 817.)

## DISPOSITION

The judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.